IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT EARL RONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:22-cv-509-TFM-N |
| | ) | |
| ALEX LOTT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is *Defendants Felecia Crawford and Kiesha Pettway's Motion for Summary Judgment* (Doc. 203, filed June 2, 2025) in which these defendants move the Court enter summary judgment in their favor and against Plaintiff Robert Earl Rone for his separate claims against them for deliberate indifference to a serious medical need, in violation of the Fourteenth Amendment. Having considered the motion, response, reply, sur-reply, and relevant law, the Court finds the motion is due to be **GRANTED**.

Related to Defendants Felecia Crawford and Kiesha Pettway's Motion for Summary Judgment are two (2) motions: (1) *Kiesha Pettway and Felicia Crawford's Rule 702 Motion to Exclude Testimony from Plaintiff's Purported Expert Ramzy Rimawi, M.D.* (Doc. 206, filed June 2, 2025) in which these defendants move the Court exclude, pursuant to Fed. R. Evid. 702, said expert testimony and (2) *Kiesha Pettway and Felicia Crawford's Motion to Strike References Made to Plaintiff's Purported Expert, Dr. Rimawi, Contained in Rone's Response to Crawford and Pettway's Motion for Summary Judgment and Motion to Strike Rone's Comments About Counsel's Truthfulness* (Doc. 241, filed August 12, 2025) in which these defendants move the Court strike references to the expert testimony that is cited in the response to their motion for

summary judgment as well as comments about their counsel's truthfulness that are asserted in the same response. Having considered the motion to exclude and motion to strike, the responses to each motion, reply to the motion to exclude, and relevant law, the Court finds the motions are due to be **DENIED**.

Also, pending before the Court is *Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law* (Doc. 208, filed June 2, 2025) in which Defendant Alex Lott moves the Court enter summary judgment in his favor and against Plaintiff Robert Earl Rone for his claim of malicious prosecution, in violation of the Fourth Amendment, and state-law claims of outrage and civil conspiracy that are brought against him. Having considered the motion, response, reply, and relevant law, the Court finds the motion is due to be **GRANTED**.

## I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental). The Court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint . . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this matter occurred in this judicial district.

No party disputes or debates the Court's jurisdiction or venue, and the Court finds adequate support for both.

## II.    BACKGROUND

### A.    Factual Background[1],[2]

On July 7, 2019, Defendant Alex Lott ("Lott") was a detective with the Mobile Police

---

[1] At the summary judgment stage, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)). "[W]here there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant." *Id.* (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)). Therefore, the recitation of facts here are those construed in favor of the plaintiff. "The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts." *Id.*

A party is obliged to address an opposing party's assertion of fact that is presented in a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e)(1)-(4); *see also* S.D. ALA. CIVLR 56(b) ("The non-movant's brief must include: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record: (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate."); S.D. ALA. CIVLR 56(d) ("The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment.").

[2] The Court consolidated for discovery purposes the two related cases that are separately brought by Robert Rone, *Rone v. Lott*, Civ. Act. No. 1:22-cv-509-TFM-N (S.D. Ala.), and Thomas Rone, *Rone v. Lott*, Civ. Act. No. 1:23-cv-154-TFM-N (S.D. Ala.). Since the two cases share much of the same factual background, the Court will present a consolidated factual background for purposes of this Memorandum Opinion and Order. References to evidentiary submissions that were filed in support or opposition to the motions for summary judgment that were filed in *Rone v. Lott*, Civ. Act. No. 1:22-cv-509-TFM-N (S.D. Ala.), will not have an identifier precede the referenced document, while the evidentiary submissions that were filed in support or opposition to the motion for summary judgment that were filed in *Rone v. Lott*, Civ. Act. No. 1:23-cv-154-TFM-N (S.D. Ala.), will be identified with "*Thomas Case*" before the referenced document.

Department ("the MPD") who responded to 2496 Schillinger Road, a What-A-Burger restaurant, about a report of a male with a stab wound. Doc. 208-1 at 2, 26. The stabbing victim, Fernando Descailleaux ("Fernando"), was found in his aunt, Mariella Rone's ("Mariella"), car in the parking lot of the restaurant. *Id.* Mariella told Lott that Fernando was stabbed by her son, Thomas Lamar Rone ("Thomas"), at her residence, 9764 Norfolk Place ("the Residence"). *Id.* at 3-4, 26. Plaintiff Robert Earl Rone ("Robert") is an attorney in Mobile, Alabama, who practices law in the areas of immigration, criminal defense, family law, and tort claims, and is Thomas' father. Doc. 208-2 at 5.

In a "Victim/Witness Statement Form" that Mariella prepared on July 7, 2019, at 5:13 PM, she described the circumstances of when Fernando was stabbed:

> I came to Tommy's room and told Lauren (his girlfriend) that he won't have visitors today. I was talking to my son Tommy and let him know I got the fuel (ethanol free gas) so he can cut the yard with Fernando my nephew. Tommy was upset about us making [him] read a book that his high school (Baker Highschool) required. Told him to help Fernando with the yard today Sunday. Tommy said yesterday he was going to help but he decided he was not. Started to be disrespectful and my nephew was telling him to respect me, then they both talk back and forth. Tommy doesn't understand we all have responsibilities and a bad attitude won't take him anywhere. Fernando was telling him to respect me and all of a sudden they started to punch each other. I tried to separate them finally Fernando left Tommy's room. Tommy went fast to the kitchen and heard something drop [on] the floor and saw him with a knife and told my nephew Fernando to be careful he has a knife and Tommy went to the bathroom and stabbed him and left the house with Lauren Butts ["Butts"].

Doc. 208-3 at 6.

After the stabbing, Butts drove Thomas in her vehicle, first, to a friend's house then to her grandmother's house. Doc. 208-1 at 27. Lott spoke with Robert via telephone, and Robert told Lott he advised Butts that Thomas needed to turn himself in to the police. *Id.* at 26. Robert's call to Butts occurred at 2:53 PM according to Lott's report. *Id.* Butts told Robert that she and Thomas would not return to the Residence at that time and would, instead, drive around then hung up on

the call.  *Id.*  Butts later told Robert she would bring Thomas home at a later time.  *Id.*  Lott then

searched for Butts' vehicle, which he observed at 4:50 PM.  *Id.* at 27.  Lott performed a traffic stop

on Butts' vehicle, and both Butts and Thomas were taken into custody then transported to the MPD

headquarters to be questioned.  *Id.*

> Lott interviewed Thomas, who, according to Lott's report, stated:

> Thomas told me that [Butts] came over earlier in the day without his parent's
> knowledge.  Thomas said he was playing a video game and was cursing at the TV
> when he heard his mom come in the house.  Thomas said he delayed cutting the
> grass and reading his book multiple times.  Thomas said his mom came in his room
> and told [Butts] to leave.  Thomas said his mom told him to go outside and cut the
> grass, but they began to argue.  Thomas said Fernando came in the room and told
> him to stop cursing at his mother.  Thomas said Fernando punched him first when
> the fight started.  Thomas said he was able to get away from Fernando and go into
> the kitchen to get a knife.  Thomas said he took a silver knife from the knife block
> and stabbed Fernando in the chest with it.  Thomas said he ran out of the house and
> got into [Butts'] car.  Thomas said [Butts] took him to a friend's house before
> driving to her grandmother's house on Bellingrath Road.

*Id.*

> Lott interviewed Butts, who, according to Lott's report, stated:

> [Butts] told me she went to Thomas's house even though she knew Thomas was
> grounded by his parents.  [Butts] said she was in Thomas's room watching him play
> a video game when his mom came in the room.  [Butts] said Mariella told her to
> leave when Thomas became upset and argue[d] with his mother.  [Butts] said
> Fernando came into the room and told Thomas to stop arguing with Mariella.  [Butts]
> said when Thomas and Fernando started fighting she left the room and waited by
> the front door.  [Butts] said when Thomas fights with his family, he always leaves
> with her.  [Butts] said she heard Mariella scream, "Thomas has a knife."  [Butts]
> said Mariella told her to call [Robert] (at the store) and tell him to come home.
> [Butts] said she called [Robert] and the left the [R]esidence.  [Butts] said Thomas
> came outside and told her to leave.  [Butts] said they went [to] a neighbor's house
> so Thomas could clean the blood off of him and then to her grandmother's house.
> [Butts] said that [Robert] called her phone repeatedly, but Thomas rejected them
> each time.  [Butts] said she was texting [Robert] and arguing with him about the
> incident.  [Butts] admitted that she knew [ ] that Thomas stabbed Fernando and that
> he was wanted by the police.  [Butts] said that she knew she needed to go back to
> the [R]esidence, but she was scared and was trying to help Thomas.  [Butts]
> acknowledged that she should not have waited the length of time to bring Thomas
> back.  The time lapse between [Butts] leaving with Thomas to the time both were

arrested in the neighborhood was 1310-1650 hours (3 hours and 40 minutes).

*Id.*

During Butts' interview, Lott noted in his report:

While speaking to [Butts], I observed multiple bruises on her arms, legs, as well as a black eye. [Butts] told me that Thomas hits her repeatedly and said that he has a severe anger problem. [Butts] declined to press charges for domestic violence.

*Id.*

As a result of the events of July 7, 2019, Butts was charged with hindering prosecution and ultimately pled guilty but was granted youthful offender status. Doc. 208-4 at 9-10. Thomas was charged with assault, first degree. Doc. 208-1 at 28. Amanda Herren ("Herren"), an assistant district attorney ("ADA") for Mobile County, Alabama District Attorney's Office ("DA's Office") at the time, was assigned as the prosecutor for Thomas' assault charge and managed the case from arraignment until September 2021, when she left the DA's Office. Doc. 208-7 at 2-4. Lott was the investigative detective for Thomas' assault charge. Doc. 208-1 at 7-8. The Honorable Ben H. Brooks was the circuit court judge to whose docket the assault case was assigned (*see* Doc. 208-5), and the matter was ultimately tried, he was found not guilty (Doc. 134 at 8).

On May 3, 2021, while Thomas' assault case was pending, Herren was contacted by Zachary Isaiah Roberts ("Isaiah") who, at the time, was in a relationship with Butts. *Id.* at 9; Doc. 208-7 at 6-8. Herren had unsuccessfully attempted to contact Butts, a fact of which Isaiah was aware, and he provided Herren with information as to where Butts lived and provided an accurate phone number to contact her. Doc. 208-7 at 8.

Herren then arranged to meet with Butts to prepare her, as a potential witness, for an immunity hearing in Thomas' then pending assault case. *Id.* at 17-18. The immunity hearing was based on the argument that Thomas acted in self-defense. *Id.* at 20. Herren coordinated with Lott

for him to transport her to the meeting with Butts. *Id.* at 17-18. Herren's meeting with Butts

occurred at Butts' grandmother's home. *Id.* at 19-20. During the meeting, Herren asked Butts

questions related to the assault case while Lott took notes of the conversation. *Id.* at 23-24. Herren

did not recall Lott asked any questions. *Id.* at 24.

During the meeting, Lott believed Butts to be credible. Doc. 208-1 at 13. Lott produced a

report of Herren's meeting with Butts. *Id.* at 12. Lott's report reads as follows:

> On 05/03/21, I was notified by [ ] Butts (19 YOA) that her ex-boyfriend, Thomas
> [ ] (19 YOA), was threatening her in reference [to] an ongoing criminal case (M219-
> 07-00826).
>
> On 05/04/21, I met with [Butts] at her residence (5781 Plantation Woods Drive).
> ADA [ ] Herren was also present at that time. [Butts] said she continued her
> relationship with Thomas after the [sic] she was put on probation from the previous
> case. [Butts] said she went to Thomas' residence after a court proceeding in March
> 2020. [Butts] said she was in the bathroom when Thomas and his father, Robert [ ],
> cornered her while video recording the encounter. [Butts] said both of them
> questioned her about what she was going to say when she testified in court. [Butts]
> said they told her to say that Thomas was putting his pants on when Fernando
> attacked him again, causing Thomas to act in [s]elf defense. [Butts] said Robert
> continued to record her until they left her alone. [Butts] said Robert has observed
> Thomas physically abusing her in the past and has done nothing to stop Thomas or
> help her.
>
> [Butts] said in the past week, she went to a friend's residence at 9316 Maplewood
> Drive and was unaware Thomas was going to be there. [Butts] said she was sitting
> on the couch texting her current boyfriend while Thomas was standing behind her.
> [Butts] said Thomas began making comments about leaving her current boyfriend
> and blocking him on social media so they could get back together. [Butts] said
> Thomas grabbed her hair and pulled her across the couch to him. [Butts] said she
> was able to get away from him and leave the residence. [Butts] said Thomas called
> her later that night and in the week saying, "I'll beat the fuck out of you, you better
> not switch up on me, you better not snitch on me." [Butts] said Thomas was saying
> these things because of her involvement with his case and testifying against him.
>
> [Butts] told me she was afraid of Thomas because of his past actions, abuse, and
> continued threats. [Butts] said she made three reports about past abuse (M220-06-
> 00293, M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, M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) but, she did not want to move forward with
> them due to Thomas threatening to hurt her and her family. [Butts] said Thomas
> knows where each of her family members live and is afraid Thomas will retaliate
> against her. [Butts] said she can not block Thomas' phone number because he uses

> a phone application that appears as a different number each time he contacts her. [Butts] also expressed interest in obtaining a protection from abuse order.

*Id.* at 37.

Butts, Herren, and Robert clarified certain portions of Lott's incident report during each of their depositions in this matter. *See* Doc. 208-4, Doc. 208-7, Doc. 231-4. Butts states, while she was in the bathroom and questioned by Robert and Thomas, they did not ask her, "what I was going to say in court, I never said that." *Id.* at 20. Butts states:

> I never even went into detail about like the things that we were talking about. I just said we were in there [, the bathroom,] and he was asking me questions about court. I didn't say about what I testified or what I was going to say in court. I just said about court. . . . I said that we were in the bathroom and he questioned us about court and was recording me - - recording us talking.

*Id.* Herren states:

> I remember [Butts] saying she was in the restroom, and Thomas and [Robert] entered the restroom, and she did not feel like she could get out, and they were asking her what she was going to testify to at a future hearing.
>
> . . .
>
> I don't have a specific memory of the word "corner."

Doc. 208-7 at 26. Robert states the bathroom incident occurred in September 2020, not in March as stated in Lott's report. *Compare* Doc. 231-4 at 27-28 *with* Doc. 208-1 at 37.

As to the incident report statement that Robert and Thomas told Butts to say Thomas was putting on pants when Fernando attacked him, Butts states:

> That - - I never said that. Because I couldn't have even said that because I didn't even see what happened like in the whole incident. I was outside of the room. There was no way that I could have said that.
>
> I told Lott that, out of my knowledge, that that's what I knew he was doing, was going to put pants on. I didn't say that's what they told me to say. I told him he was going back there to put pants on because he had no pants on.
>
> . . .

Because once he did go back to put his pants on, that's when it happened. But I didn't see that. And I just told Lott he was going back to put his pants on, and this is how it came out. I don't know how.

But basically I didn't say any of this.

Doc. 208-4 at 21-22.

As to the circumstances of when Robert stopped recording Butts in the bathroom, Butts

states:

So after we had talked about like court or whatever we were talking about in the video, he ended the recording and walked away.

. . .

So I must have said like when we were done talking, he walked away and ended the recording. But that's how I knew he was recording because like I just seen him turn it off. But I don't know - - the continued recording until they left me alone, they weren't really bothering me.

*Id.* at 22-23.

As to whether Robert observed Thomas abuse Butts and not take action to help her, Butts

states:

Robert has seen Tommy put his hands on me. He was actually on top of me choking me, and him and Mally walked in. And it was like: Get off of him or something or stop or whatever.

But I'm like: I'm not on him, he's on me.

But yeah, that's accurate. But not the "nothing to stop or help" because they did say stop.

*Id.* at 23-24.

As to the whether Butts expected Thomas to be at the Maplewood Drive home, Butts states:

Yeah. That's not right. Because I rode with Tommy there.
. . .
We met at the Walmart and then got in his car, and we rode together there.
. . .

No, no.  I told them we went there together.  Obviously I knew he was there.

*Id.* at 24-25.

As to Thomas' actions while at the Maplewood Drive home, Butts states:

At this point he's like coming up in front to sit next to me.  And this is when he grabs me up.

I don't know how to describe Tommy, but he's just like rough.  He grabbed me up and was like:  You need to leave him, whatever.

It was kind of like an argument, but it wasn't like a full-blown argument.  We didn't get like really physical.  It was just like he grabbed me up because he saw me texting him.

. . .

[L]ike there was no hair pulling.  There was no snatching across the couch to him.  It was like he grabbed me up, just myself, my shoulders, me.

. . .

[W]e left together, but we quit arguing.  Like it calmed down and we got away from each other for a minute.  He went outside with his friend.  And I had to ride home with him.  Well, he had to take me to my car.

*Id.* at 26-27.

As to Thomas' communications with Butts after the events at the Maplewood Drive home that were described in the report--"I'll beat the fuck out of you, you better not switch up on me, you better not snitch on me"--Butts states:

That's accurate.  Not the "snitch" part.  But the "switch up," he called and texted and called.  But this was all in relation to the Isaiah situation because we had discussed like he wanted to get back together.  And I was like considering it but not really.  And it was more like don't switch, my words, of us getting back together.

*Id.* at 27-28.

As to reports of past abuse of Butts by Thomas, Butts states, "I feel like I called once.  My Mom was the other two.  I was with my mom - - one of them I was with my mom, one my mom

was by herself, and then one I called like by myself." *Id.* at 30.

As to threats made by Thomas against Butts and her family because of the reports made against him, Butts states, "I didn't want to move forward because of this. But also that. Because that's true. He would threaten us." *Id.*

Once the DA's Office receives an officer's report, it may issue a charging document, refuse to prosecute, or request the officer conduct further investigation, among other options. Doc. 208-7 at 33-34. After Herren reviewed Lott's report, she approved a warrant for Thomas for intimidating a witness. *Id.* at 28. Lott submitted his incident report to the charging office at the DA's office, which prepares charging documents, and ADA Bren McMaken, who was in charge of that office, took the file to the district attorney, Keith Blackwood, who approved a warrant for Robert's arrest for the charge of intimidating a witness. Doc. 208-1 at 21-22, 61; Doc. 208-7 at 22, 29, 37. The charging office also prepared a charging document for Thomas that identified two (2) offenses: domestic violence, second degree for intimidating a witness, a felony, and domestic violence, third degree, for harassment, a misdemeanor. *Thomas Case*, Doc. 54-2 at 34.

After the charging documents for Robert and Thomas were approved, on May 5, 2021, Lott took the documents to Magistrate Shelly Lee. Doc. 208-1 at 17-20, 23-25, 57. Separate complaints for Robert and Thomas were prepared in the magistrate's office, and Magistrate Lee signed the complaint and warrants for Robert and Thomas' arrests on the same date. Doc. 208-1 at 57-58; Doc. 208-7 at 21; *Thomas Case*, Doc. 54-2 at 29, 33. For each of the warrants for Robert and Thomas, Lott was the sworn complaining witness. Doc. 208-1 at 57; *Thomas Case*, Doc. 54-2 at 29, 33.

The complaint against Robert reads:

BETWEEN 3/1/21 & 3/31/21, ATTEMPT BY USE OF A THREAT DIRECTED TO LAUREN OLIVIA BUTTS, A WITNESS OR A PERSON HE BELIEVED

WOULD BE CALLED AS A WITNESS IN AN OFFICIAL PROCEEDING, TO-WIT: AN IMMUNITY HEARING ON 5/11/21,
TO CORRUPTLY INFLUENCE THE TESTIMONY OF THAT PERSON, INDUCE THAT PERSON TO AVOID LEGAL PROCESS SUMMONING HIM/HER TO TESTIFY OR INDUCE THAT PERSON TO ABSENT HIMSELF FROM AN OFFICIAL PROCEEDING TO WHICH HE/SHE HAD BEEN ELGALLY SUMMONED,
IN VIOLATION OF 13A-010-123 OF THE CODE OF ALABAMA, AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

Doc. 208-1 at 57.

The complaint against Thomas for the felony offense of domestic violence, second degree, for intimidating a witness reads:

ON OR ABOUT 4/25-5/1/21, THOMAS RONE COMMITTED THE CRIME OF INTIMIDATING A WITNESS PURSUANT TO SECTION 13A-10-123, TO-WIT: THOMAS RONE THREATENED WHITNESS [sic] LAUREN OLIVIA BUTTS BY CALLING HER AND SAID "IF YOU TESTIFY, I WILL BEAT THE FUCK OUT OF YOU",
WITH THE VICTIM BEING THE DEFENDANT'S EX-GIRLFRIEND,
IN VIOLATION OF
SECTION 13A-6-131, CODE OF ALABAMA 1975.
IN VIOLATION OF 13A-006-131 OF THE CODE OF ALABAMA
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

*Thomas Case*, Doc. 54-2 at 33.

The complaint against Thomas for the misdemeanor offense of domestic violence, third degree, for harassment reads:

ON OR ABOUT 4/25-5/1/21, COMMIT THE CRIME OF HARASSMENT (SECTION 13A-011-008(A), CODE OF ALABAMA [(]1975), WITH INTENT TO HARASS, ANNOY OR ALARM ANOTHER PERSON, TO-WIT: LAUREN OLIVIA BUTTS:
      (X)    STRIKE, SHOVE, KICK OR OTHERWISE TOUCH ANOTHER PERSON, TO-WIT: LAUREN BUTTS, OR SUBJECT THEM TO PHYSICAL CONTACT, TO-WIT: GRABBED THE VICTIM BY THE HAIR OF HER HEAD AND PULLED HER FROM ONE SIDE OF THE COUCH TO THE OTHER SIDE;
WITH THE VICTIM BEING THE DEFENDANT'S EX-GIRLFRIEND.
IN VIOLATION OF 13A-006-132 OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

*Id.* at 29.

On May 7, 2021, at approximately 12:49 PM, both Robert and Thomas were arrested at the Residence then transported to the Mobile County Metro Jail ("MCMJ"). Doc. 208-2 at 26; *Thomas Case*, Doc. 54-2 at 28. After Robert was arrested and placed handcuffed in the back of a marked MPD vehicle, he informed officers he had a medical condition that caused him to sometimes have spasms in his esophagus, a condition that was diagnosed approximately thirty (30) years prior and for which he received continuous treatment since the diagnosis. Doc. 205-1 at 16.

Robert was prescribed Clonazepam for his condition, which caused him to feel sleepy, so he determined he no longer wished to take the medication. *Id.* at 17. Approximately two weeks prior to Robert's arrest, he told his doctor he wanted to cease taking the Clonazepam, so she told him to keep some on his person in case of an emergency. *Id.*

Robert states when he feels a spasm is about to occur, or when a spasm occurs, if he takes a Clonazepam, the spasms cease within fifteen (15) minutes. *Id.* Robert states the spasms may occur without warning or, sometimes, he may feel tightening that precedes a spasm. *Id.* at 18. Robert states the spasms feel like they occur near the bottom of his sternum and:

> It feels like somebody's got both hands around [his] heart, and they're squeezing [his] heart. . . . [I]t'll feel like it's squeezing once, and then it'll be a few minutes later before it does it again. Other times it'll be like several times in a row. And when it does that. It affects my breathing.

*Id.*

When Robert was arrested, he had in his pocket two (2) or three (3) Clonazepam pills either wrapped in a piece of toilet tissue or in a little plastic bag. *Id.* at 65. Robert states he believes he told the officer about the pills on his person when he was transported to the MCMJ but is certain he told someone about them when he arrived at the MCMJ. *Id.*

Before Robert was placed in the MPD vehicle, he told the officers about his medical

condition and requested a bottle of water. *Id.* at 18.  While Robert was transported to the MCMJ, he began to experience an esophageal spasm. *Id.*  Robert states he began to experience the spasms approximately twenty (20) or thirty (30) minutes before he arrived at the MCMJ, which jail records indicate occurred at 1:57 PM. *Id.*  Specifically, Robert states he began to experience the spasms within a few seconds after the MPD officer's vehicle left Robert's neighborhood. *Id.* at 19.  The officer in the MPD vehicle stopped the vehicle then gave Robert a bottle of water, which Robert states helped control the spasms. *Id.* at 18-19.

Robert was brought to the MCMJ intake at approximately 1:55 PM, proceeded to be processed in the intake area, then finally led to a small cell that he alone occupied. *Id.* at 20, 69; Pl.'s Video 1[3] at 00:10-00:20.  Robert's Clonazepam pills were confiscated either when he was arrested, or at the jail, and his water bottle was confiscated at intake.  Doc. 205-1 at 20.  Robert asked for the water bottle, but his request was refused. *Id.* at 67.  An intake officer asked Robert about the pills that were found on him to which he responded it was medication for seizures that he believed he needed at that moment because he was experiencing a seizure. *Id.*; Pl.'s Video 1 at 03:22-03:35.  Robert told the intake officer they could call his doctor to verify the identity of the pills.  Doc. 205-1 at 68.  Robert is not certain what the intake officer did with the pills. *Id.* at 67.  Robert asked the intake officer if he could take his pills to which she responded he could be provided water, but she was not allowed to provide him pills, which required a nurse.  Pl.'s Video 1 at 13:15-13:42.  Robert was in intake for approximately twenty (20) minutes when the intake

---

[3] Plaintiff filed a *Notice of Conventional Filing in Support of Plaintiff's Response to Defendants Felecia Crawford and Keisha Pettway's Motion for Summary Judgment* in which he notifies the Court he conventionally filed a flash drive that contains three (3) video files: (1) RR-Rone-082, (2) NPS-MCMJ-0087-2, and (3) NPS-MCMJ-0089-4.  Doc. 234. The Court will refer to:
    1.    RR-Rone-082 as "Pl.'s Video 1;"
    2.    NPS-MCMJ-0087-2 as "Pl.'s Video 2;" and
    3.    NPS-MCMJ-0089-4 as "Pl.'s Video 3."

officer called for medical assistance for him, because he stated he had chest pains and felt he was about to have a seizure. Doc. 205-1 at 69; Pl.'s Video 1 at 14:40-15:04.

When Robert was brought to the MCMJ, Defendant Keisha Pettway ("Pettway"), who was a registered nurse ("RN") and worked for NaphCare, was the intake nurse at the facility. Doc. 205-5 at 3-4. At approximately 2:11 PM, Pettway arrived at the intake area in response to Robert's medical assistance call for an initial evaluation. Doc. 205-1 at 69; Doc. 205-5 at 10; Pl.'s Video 1 at 16:22-16:32. Robert told Pettway he needed his medicine that was confiscated, but one of the intake officers stated they would not give the pills to Robert because they were not in a pill bottle. Doc. 205-1 at 69; Pl.'s Video 1 at 17:05-17:28. Robert told Pettway she could verify the medication with his doctor. Doc. 205-1 at 69. Robert told Pettway he was experiencing spasms, and chest pain, and he had gone to the hospital a couple of weeks earlier with high blood pressure. *Id.* at 69-70. Pettway then left the intake area to contact a provider, Defendant Felicia Crawford ("Crawford"), certified registered nurse practitioner (CRNP), and relayed Robert's symptoms to Crawford. Doc. 205-5 at 9, 31. Crawford told Pettway she should call an ambulance, a decision Crawford states she was obliged to perform. *Id.* at 30-31. Records show Pettway contacted the ambulance service at approximately 2:39 PM. *Id.* at 21.

After Pettway contacted Crawford, she returned to meet with Robert in intake to collect then input information about him in a computer. Doc. 205-5 at 16. Some of the collected information included Robert was prescribed Clonazepam, which the computer system verified, and his symptoms of esophageal spasms and chest pain. *Id.* at 10, 16.

At some point after Robert met with Pettway, he was escorted out of intake to a room where his blood pressure was taken. Doc. 205-1 at 71. Robert recalls a young white female, not Pettway, measured his blood pressure. *Id.*

As to why Crawford decided to have Robert sent to a hospital via ambulance, she states it was based on Pettway's report that Robert was experiencing esophageal seizures and chest pain. Doc. 205-6 at 16. Crawford states she wanted to ensure Robert was not having a heart attack and the MCMJ did not have the proper equipment to evaluate him for such, since it was equipped only for basic life support. *Id.* at 19. Crawford states she does not remember personally evaluating Robert before he was transported via ambulance to a hospital, but based on the note that she authored in Robert's medical file, she is sure she met with Robert to draft the note. *Id.* at 27. Crawford states she would have indicated whether her note was based on information from a third party. *Id.* Based on Crawford's evaluation of Robert, she noted of him "67 y/o w/m seen in Intake for abnormal VS [vital signs], and c/o [complaint of] epigastric spasms he has experienced for over 20 yr. Report he takes clonazeapam for spasm. Denies N/V [nausea/vomiting], numb[n]ess or tingling." Doc. 205-7 at 22. Crawford's timecard for May 7, 2021, shows she clocked out of work at 3:19 PM, and the record of her evaluation of Robert was entered at 3:33 PM. Doc. 193 at 3; Doc. 205-7 at 22.

When Pettway contacted an ambulance service for Robert, she called Newman's Medical Services, Inc. ("Newman's"), which documented the call was received at "14:38:51" (2:38 PM). Doc. 205-8 at 4. Susan Rose answered Pettway's call and documented the reason for the call was a complaint of "chest pain (non-traumatic)" that was assigned a priority of "2 (Emergent)." *Id.* A response for the call was activated at "14:41:53" (2:41 PM), an ambulance was assigned at "15:00:08" (3:00 PM), and the ambulance was en route to the MCMJ at "15:04:35" (3:04 PM). *Id.* at 5. The ambulance arrived at the MCMJ at "15:10:58" (3:10 PM) then began to transport Robert to Providence Hospital at "15:23:10" (3:23 PM) and arrived at the hospital at "15:53:56" (3:53 PM). *Id.* at 4-5.

While at the hospital, Robert was administered several prescriptions-GI cocktail, Protonix, Zofran, and clonazepam-but declined an EKG or any other diagnostic testing. Doc. 205-9 at 94. The hospital records show under "History of Present Illness":

> The patient presents with Throat spasms. Pt reports that he was being taken to prison today and began to be stressed and developed esophageal spasms. He has a history of throat spasms. He was not given his medication to relieve the spasms so he wanted to come here for relief. The onset was just prior to arrival. The course/duration of symptoms is constant. The degree at onset was minimal. The degree at present is minimal. Therapy today: see nurses notes. Associated symptoms: none.

*Id.* at 92. Robert was discharged to the custody of the MPD and returned to the MCMJ. *Id.* at 76, 94, 153. After Robert returned to the MCMJ, he was placed in a holding cell, where he remained for approximately thirty (30) minutes to one (1) hour before his wife posted his bond and he was released. *Id.* at 77.

On June 17, 2021, the complaint against Robert for intimidating a witness and the complaint against Thomas for domestic violence, second degree, for intimidating a witness came before Judge Hardesty of the District Court of Mobile County, Alabama, for a preliminary hearing. Doc. 208-6. During the preliminary hearing, counsel for Robert played an excerpt of the recording of the bathroom conversation between Robert, Thomas, and Butts, which was transcribed as follows in relevant part:

| | |
|---|---|
| MR. ROBERT RONE: | Did you ever tell - - Tommy, did you ever tell the police anything? Did you talk to them, say what happened, anything? |
| MR. THOMAS RONE: | Yeah. |
| MR. ROBERT RONE: | What'd you tell them? |
| MR. THOMAS RONE: | That I got my ass whooped. |
| MR. ROBERT RONE: | And what'd you tell them about the sticking? |
| MR. THOMAS RONE: | Huh? |
| MR. ROBERT RONE: | What'd you tell them about the stabbing? |
| MR. THOMAS RONE: | I was just like after, like, I got my ass whooped, I was walking in the living room. And, like, I wasn't even walking. I was just like I was just in the living room. |

|                      | I was walking out to the door and I went to the kitchen. And, then, I didn't have no clothes on. I went back here. |
|----------------------|------------------------|
| MR. ROBERT RONE:     | And you told them all that? |
| MR. THOMAS RONE:     | I don't remember what I told him, to be honest. |
| MR. ROBERT RONE:     | But you didn't tell him you were trying to stick him or anything? |
| MR. THOMAS RONE:     | No. Hell, no. |
| MR. ROBERT RONE:     | Did you tell them anything? |
| MS. BUTTS:           | Huh-uh. By the time that they already questioned him, they were already in my face saying, "Well, this is what," dih, dih, dih, dih, dih. I was like, "Well" - - |
| MR. ROBERT RONE:     | Did you say - - did you say the officer kept trying to getting you to say Tommy beat on you? |
| MS. BUTTS:           | Huh-uh. |
| MR. ROBERT RONE:     | I thought you told me that a couple weeks ago. |
| MS. BUTTS:           | What do you mean? |
| MR. ROBERT RONE:     | You said he kept trying to get you to say that Tommy beat you up or something. |
| MS. BUTTS:           | Oh, yeah. I thought you meant did I say that to them. |
| MR. ROBERT RONE:     | Oh. |
| MS. BUTTS:           | And I was like, no. |
| MR. ROBERT RONE:     | But you never told them that he did? |
| MS. BUTTS:           | Huh-uh. I didn't say - - tell anybody that they were making me do that - - |
| MR. ROBERT RONE:     | Yeah. You said he kept saying several - - |
| MS. BUTTS:           | Or telling me, but they were. |
| MR. ROBERT RONE:     | Yeah. You said several times he was trying to get you to say that Tommy did. |
| MS. BUTTS:           | They were. They were like, "He said y'all aren't even together," like trying to make me mad at him. |
| MR. THOMAS RONE:     | Oh, I didn't even say that. |
| MS. BUTTS:           | Yeah. No. They were like, "He said y'all are just friends and he don't - - " |

. . .

|                      |                        |
|----------------------|------------------------|
| MS. BUTTS:           | - - and he doesn't even want you, dih, dih, dih, trying to make me say something about, like - -
They were just telling me - - they were like, "So he did that to your eye?" I was, like, "No."
"So he did that to your eye." They kept, like, on and on and on. |
| MR. ROBERT RONE:     | Did you have some bruises? |
| MS. BUTTS:           | I had a black eye, so that's why they assumed that it |

|  | was - - |
| MR. THOMAS RONE: | The black eye that she had had is when I threw something at her and she - - it hit her. |
| MS. BUTTS: | So when I got arrested and went in, I had the black eye, so they automatically assumed, like, he did that to her. |
| MR. ROBERT RONE: | But was that an accident? |
| MR. THOMAS RONE: | Yeah, it was an accident. |
| MS. BUTTS: | Yeah. It was when we were at a party. |
| MR. ROBERT RONE: | Oh. So he didn't beat you up. It was just an accident. |
| MS. BUTTS: | It was like way - - no. It was way before, like . . ." |

Doc. 208-1 at 48-49.

After the recording was played, Butts testified as to the bathroom conversation, "I just felt scared, like I had to lie. . . . Because [Robert] was asking me if I had told the cops anything, and I was saying no." *Id.* at 2. Butts testified she felt intimidated and wanted to tell Robert what she believed he wanted to hear but stated he did not either threaten her with physical harm or physically injure her. *Id.* at 3. Butts felt like she "had to lie or say what they would want me to say or I'd get hurt, not by [Robert] but Thomas." *Id.* at 7. Butts characterized the incident as being confined by Robert and Thomas because they were in the doorway of the bathroom. *Id.* at 4. Butts confirmed Robert and Thomas wanted her to report Thomas stabbed Fernando in self-defense. *Id.* at 10. As to whether Thomas told Butts, "I'll beat the fuck out of you, you better not switch up on me, you better not snitch on me," she confirmed the statement was made and stated he said it multiple times. *Id.* at 51. Ultimately, Judge Hardesty determined there was not probable cause to support Robert's charge of intimidating a witness. *Id.* at 11. However, Judge Hardesty found probable cause to support Thomas' charges of domestic violence, second degree, for intimidating a witness and bound the case to a grand jury for further action. *Thomas Case*, Doc. 54-2 at 53.

On the same date, Butts filed, under penalty of perjury, a "Petition for Protection From Abuse" ("PFA") against Thomas. *Thomas Case*, Doc. 54-1 at 45-50. In response to the prompt

"Describe how the Defendant [,Thomas,] hurt or threatened the Plaintiff [,Butts,] or how the

Plaintiff is in imminent danger of becoming a victim," Butts detailed:

> [G]rabbed me by the hair and pulled me to where I couldn't get away from him
> while threatening to "beat the fuck out of me" . . . (continued)
> . . .
> Because he saw a guy he didn't like text me.
> Throughout our 4 year relationship these are some things he has done:
> - I went to pick him up from a party and he was drunk and didn't want
> to leave, so he grabbed my hair and threw me against the wall, where I fell onto the
> floor.
> - Our first case we were involved in we had just gotten home from a
> court date where he was under the impression I told on him he hit me in my head
> and I was able to lock myself in a room away from him. He proceeded to break the
> door and throw it on my chest/neck and [I] was unable to breathe until the last
> minute then he took it off.
> - We were at a party and a guy mentioned to [T]ommy that I had
> spoke to him earlier that night. [H]e got mad and shoved me on the ground where
> I hit my head and then he threw a full beer can at my eye causing me to have a black
> eye.
> - [M]y black eye had just recently healed and we were on the way
> home from the store and he got mad and tried speeding up saying he was going to
> kill us then punched the mirror off the car and gave me a second [b]lack eye with
> it.
> - [L]eaving a party with friends where I later found out him and his
> friend did cocaine, he got mad for me driving the car and punched the side of my
> head over and over until I almost black out, I had a concussion and a giant knot on
> my head for weeks.
> - Pulled a firearm at me multiple times, after telling him repeatedly I
> was uncomfortable and scared of him doing that.

*Id.* at 46-47. In response to the prompt "I genuinely fear the Defendant will cause further abuse

because," Butts detailed, "[H]e has pulled firearms on me and I have been seriously injured by him

multiple times. I am scared if given the opportunity he would harm me again." *Id.* at 46.

Thomas' misdemeanor charge of domestic violence, third degree, for harassment was

dismissed on August 26, 2021, and his felony charge of domestic violence, second degree, for

intimidating a witness was *nol prossed* on August 15, 2022. *Thomas Case*, Doc. 64-3 at 19, 21.

**B.    Procedural Background**

The original Complaint in this matter was filed by Robert, who was a *pro se* litigant,[4] on December 22, 2022.  Doc. 1.  On December 28, 2022, Robert filed as a matter of course, pursuant to Fed. R. Civ. P. 15(a)(1)(A), a First Amended Complaint, in which he named as defendants Mobile County District Attorney Ashley M. Rich, individually ("Rich"); Mobile County Assistant District Attorney Amanda Herren, individually; the Mobile County District Attorney's Office ("the MCDAO"); Detective Alex Lott, individually; and fictious defendants that were described as "those individuals workings as jailers or medical personnel at Mobile County Metro Jail on May 7, 2021, who delayed or denied medical treatment for [Robert] while he was being held as a pretrial detainee."  Doc. 3.

On January 19, 2023, the MCDAO, Rich, and Herren filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6) (Doc. 8) and brief in support (Doc. 9), and on January 26, 2023, Lott filed a separate motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 14).  On May 6, 2023, Robert filed a motion for leave to file a second amended complaint to dismiss his claims against the MCDAO; add as defendants Kiesha Pettway, Felecia Crawford, and Sophia Barnes, who were involved with Robert's medical treatment at the MCMJ; and reorder, add, and delete certain of his claims.  Doc. 27.  The Court granted the motion for leave to file a second amended complaint, and ordered Robert's Second Amended Complaint be separately docketed.  Doc. 30. The Second Amended Complaint became the operative complaint, so the Court denied as moot the motions to dismiss the First Amended Complaint.  Doc. 32.

On June 1, 2023, Rich and Herren again filed a motion to dismiss the Second Amended

---

[4] While Rone initially was a *pro se* litigant, he is an attorney and member of the Alabama State Bar.  Doc. 31 at 2.

Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 35) and brief in support (Doc. 36), and on the same date, Lott filed an answer to the Second Amended Complaint (Doc. 37). Pettway, Barnes, and Crawford separately filed motions to strike, or alternatively, dismiss the Second Amended Complaint on June 7, 2023 (Doc. 39), July 5, 2023 (Doc. 48), and July 13, 2023 (Doc. 54), respectively. The motions to dismiss was referred to the assigned Magistrate Judge for disposition.

On August 9, 2023, the Magistrate Judge entered a Report and Recommendation for Rich and Herren's motion to dismiss, in which she recommended the motion be granted, such that Count 2 be dismissed with prejudice in its entirety and Counts 1, 4, and 5 be dismissed with prejudice as to Rich and Herren. Doc. 59. On the same date, the Magistrate entered a Report and Recommendation for Pettway, Barnes, and Crawford's separate motions to strike, or alternatively, dismiss, in which she recommended the motions be granted to the extent the motions sought to dismiss Count 3 as a shotgun pleading, but the dismissal was without prejudice and Robert was granted leave to file a third amended complaint to address the noted deficiencies. Doc. 60. On December 8, 2023, the Court adopted the Magistrate Judge's reports and recommendations as the opinion of the Court and dismissed Rich and Herren as defendants in this matter and ordered Robert to file a third amended complaint by a time certain. Doc. 62

Robert timely filed a Third Amended Complaint (Doc. 65) on January 4, 2024, to which the remaining defendants, Barnes, Crawford, Lott, and Pettway, filed separate answers (Docs. 67, 68, 69, 73).

On February 7, 2024, the Court entered a Preliminary Scheduling Order (Doc. 77) that set the due date for the parties' report of their planning meeting, pursuant to Fed. R. Civ. P. 26(f), which was extended by an Order of the Court (Doc. 86). The parties timely submitted their report (Doc. 88), and after a telephonic scheduling conference was held (Doc. 89), the Court entered a

scheduling order (Doc. 91), pursuant to Fed. R. Civ. P. 16(b), that, among other things, set the time

by which the parties could request leave to amend their pleadings to September 16, 2024.  On

September 9, 2024, Robert filed a motion to extend the deadline to amend his Third Amended

Complaint (Doc. 106), which was granted in part and the deadline for the parties to amend their

pleadings was extended to September 25, 2024 (Doc. 108).

On September 16, 2024, Lott filed an Unopposed Motion to Consolidate in which he

requested the Court consolidate, pursuant to Fed. R. Civ. P. 42(a), this matter with a related action

before the Court, *Rone v. Lott*, Civ. Act. No. 1:23-cv-154-TFM-N (S.D. Ala.) (previously referred

to as "the *Thomas Case*") for discovery purposes.  Doc. 109.  An identical motion was filed by

Lott in the *Thomas Case.  Thomas Case*, Doc. 33).  The Court granted the motions in the separate

cases, ordered any non-discovery motions that pertain to an individual case should be filed in the

original case, and referred the issue of an amended scheduling order to the Magistrate Judge.  Doc.

110; *Thomas Case*, Doc. 34.  After a scheduling conference with the parties (Docs. 111, 113), the

Court entered a supplemental scheduling order, which set the deadline for the parties to request

leave to amend their pleadings to December 15, 2024 (Doc. 117).

On December 14, 2024, Robert filed a motion for leave to file a fourth amended complaint

to dismiss Barnes and fictitious defendants, add details to the presented facts and to certain Counts,

and update certain Counts.  Doc. 126.  The Court granted the motion for leave to amend (Doc.

133), and Robert separately filed a Fourth Amended Complaint (Doc. 134) on December 30, 2024.

In the Fourth Amended Complaint, Robert asserts five (5) Counts: (Count 1) malicious prosecution

in violation of the Fourth Amendment against Lott, (Count 2) deliberate indifference to a serious

medical need in violation of the Fourteenth Amendment against Pettway, (Count 3) deliberate

indifference to a serious medical need in violation of the Fourteenth Amendment against Crawford,

(Count 4) outrage/intentional infliction of emotional distress in violation of Alabama law against Lott, and (Count 5) civil conspiracy in violation of Alabama law against Lott. Doc. 134. Crawford, Lott, and Pettway separately filed answer to the Fourth Amended Complaint. Docs. 135, 136, 138.

On March 20, 2025, Robert filed Plaintiff's Motion for Leave to File Fifth Amended Complaint in which he sought to amend his complaint under Fed. R. Civ. P. 15(a)(2) to relate back to the original complaint, pursuant to Fed. R. Civ. P. 15(c), to add Mobile County District Attorney Keith Blackwood as a defendant and bring claims against him in his individual capacity. Doc. 154. Robert later filed Plaintiff's Motion to Substitute the Proposed Fifth Amended Complaint Attached Hereto for the Proposed Fifth Amended Complaint filed on March 24, 2025, in which he sought to add an allegation that Pettway violated MCMJ policy when she allowed Robert to be admitted to the jail rather than direct the transporting officer take him to the hospital as well as additional factual details to previously alleged facts. Doc. 176. The Court ordered Robert to file a brief in support of his motion for leave to amend to address the timeliness of the motion as well as how the allegations in his proposed fifth amended complaint would overcome immunity arguments that would render the proposed fifth amended complaint futile. Doc. 155. The Court also set a deadline for the parties who opposed the motion to file a response. *Id.* After the parties filed their respective briefs (Docs. 157, 159, 160), the Court found Plaintiff's newest proposed amendments to his complaint were untimely and denied his request. Doc. 185.

On June 2, 2025, Crawford and Pettway filed a motion for summary judgment (Doc. 203) and brief (Doc. 205), and evidentiary material (Doc. 204), in support of the motion, and Lott filed a separate motion for summary judgment (Doc. 208) and evidentiary material (Doc. 209) in support of the motion. On the same date, Crawford and Pettway filed a motion to exclude the testimony of Robert's purported expert, Ramzy Rimawi, M.D., pursuant to Fed. R. Evid. 702 (Doc.

206) and brief in support of the motion (Doc. 207). The Court entered a briefing schedule for the motions for summary judgment and the motion to exclude. Doc. 211. Robert timely filed a response to the motion to exclude (Doc. 228) and evidentiary material in support of the response (Doc. 207) as well as separate responses to the motions for summary judgment (Docs. 233, 235) and evidentiary material in support of the responses (Docs. 231, 232, 234). Crawford and Pettway, and Lott, timely filed their replies to their respective motions for summary judgment. Docs. 238, 240. Robert filed a motion to file a surreply to the motion to exclude (Doc. 236), which was granted (Doc. 237), and the surreply (Doc. 239) was filed. Robert also filed a motion to file a surreply to Crawford and Pettway's motion for summary judgment or, in the alternative, schedule a hearing (Doc. 242), which the Court granted as to his request to file a surreply and denied as to his request to schedule a hearing (Doc. 243), and the surreply (Doc. 245) was filed. Crawford and Pettway, in turn, filed an unsolicited response to Robert's surreply. Doc. 246.

Crawford and Pettway also filed a motion to strike references to Robert's purported expert, Ramzy Rimawi, M.D.'s, testimony that is cited in Robert's response to their motion for summary judgment as well as Robert's comments about their counsel's truthfulness that are asserted in the same response. Doc. 241. Robert filed a response to the motion strike. Doc. 244.

The motions for summary judgment, motion to exclude, and motion to strike are, therefore, ripe for review, and the Court finds unnecessary oral argument to address the motions.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258,

1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[5]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id.*

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(e)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial.  *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

---

[5] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id*. (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56€, the court may: (1) give an opportunity to properly support or address the fact; (2) consider

the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV.    DISCUSSION AND ANALYSIS

The Court will address the motions that are before it in the following order: (1) Crawford and Pettway's motion for summary judgment, (2) Crawford and Pettway's motion to exclude, (3) Crawford and Pettway's motions to strike, then (4) Lott's motion for summary judgment.

## A.    Crawford and Pettway's Motion for Summary Judgment (Doc. 203)

In Crawford and Pettway's motion for summary judgment, each argues Robert cannot show she was deliberately indifferent to his necessary medical needs. Doc. 205. Crawford argues her decision to request an ambulance for Robert was reasonable and she did not refuse him either water or medication that was from the approved dispensary. *Id.* at 27-30. Pettway states Robert's argument that she should have provided different treatment or done more to treat him does not rise to the level of deliberate indifference. *Id.* at 30-34. Both Crawford and Pettway argue expert testimony supports the decision to not allow Robert to take the loose medication that was found on his person and to call for an ambulance to transfer him to Providence Hospital. *Id.* at 34-36. Finally, Crawford and Pettway argue, if any of Robert's claims against either of them proceeds to trial, his claim for punitive damages should still be dismissed because there is insufficient evidence to show either of them were motivated by evil intent or acted with reckless indifference to Robert's rights. *Id.* at 36.

In response, Robert argues he had a serious medical need that was diagnosed by a doctor and obvious to a layperson, his serious medical need resulted in serious harm when his esophageal spasm lasted longer than three (3) hours and resulted in a Shingles outbreak and facial nerve

damage, Crawford and Pettway knew there was a substantial risk of serious harm to Robert if he

did not receive immediate treatment, Crawford and Pettway did not provide Robert with his

medication even after the prescription was verified and, instead, sent him to Providence Hospital

by ambulance, which further delayed when he ultimately took his prescription, Crawford and

Pettway's treatment of Robert (i.e., contacting an ambulance) was so cursory as to amount to no

treatment, and Pettway delayed contacting an ambulance for Robert by twenty-six minutes after

she first met with him.  Doc. 235.

### 1.    Deliberate Indifference to a Serious Medical Need

> "To show that a prison official acted with deliberate indifference to serious medical
> needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow
> v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  To meet the first prong, the plaintiff
> must demonstrate an "objectively serious medical need"—*i.e.*, "one that has been
> diagnosed by a physician as mandating treatment or one that is so obvious that even
> a lay person would easily recognize the necessity for a doctor's attention," and, in
> either instance, "one that, if left unattended, poses a substantial risk of serious
> harm."  *Id*. (alteration adopted) (quotations omitted).  To satisfy the second,
> subjective prong, the plaintiff must prove that the prison officials "acted with
> deliberate indifference to [his serious medical] need."  *Harper v. Lawrence Cty.*,
> 592 F.3d 1227, 1234 (11th Cir. 2010) (quotation omitted).  "To establish deliberate
> indifference," a plaintiff must demonstrate that the prison officials "(1) had
> subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3)
> acted with more than gross negligence."  *Id.* (quotation omitted).  An inmate-
> plaintiff bears the burden to establish both prongs.  *Goebert v. Lee Cty.*, 510 F.3d
> 1312, 1326 (11th Cir. 2007).

*Hoffer v. Sec., Fla. Dep't of Corrections*, 973 F.3d 1263, 1270 (11th Cir. 2020) (footnote omitted).

Gross negligence standard is described as "the equivalent of recklessly disregarding a substantial

risk of serious harm to the inmate."  *Wade v. McDade*, 67 F.4th 1363 (11th Cir. 2023) (citations

and internal quotation marks omitted).

> "[A] complaint that a [medical professional] has been negligent in diagnosing or
> treating a medical condition does not state a valid claim of medical mistreatment."
> *Estelle v. Gamble*, 429 U.S 97, 106 [ ] (1976).  Indeed, "[m]edical malpractice does

not become a constitutional violation merely because the victim is a prisoner," *id.* at 106 [ ], "[n]or does a simple difference in medical opinion" become one, *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). That said, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley*, 182 F.3d [1248,] 1255 [(11th Cir. 1999)].

*Ireland v. Prummell*, 53 F.4th 1274, 1293 (11th Cir. 2022).

Here, Pettway responded to the call from the intake officer to report Robert's condition. Pettway then contacted Crawford after she performed an initial evaluation of Robert. Robert told Pettway he was experiencing spasms, and chest pain, and had gone to a hospital a couple of weeks earlier with high blood pressures, symptoms that Pettway relayed to Crawford. Based on the symptoms that Pettway relayed to Crawford, she determined Pettway should call an ambulance. Pettway arrived at the intake area to perform Robert's evaluation at approximately 2:11 PM, and after performing the evaluation, spoke with Crawford then ultimately contacted the ambulance service at approximately 2:39 PM. Crawford states the decision to have Robert sent to a hospital was based on Pettway's report that he was experiencing esophageal seizures and chest pain and she wanted to ensure he was not having a heart attack, a condition for which the MCMJ was not equipped to evaluate him.

Robert takes exception to Crawford's diagnosis of his condition as a possible heart attack, rather than esophageal spasms that he reported was treated with his prescription, as well as the course of treatment for such. However, the evidence that is before the Court shows Pettway responded within minutes to the call from intake that Robert was experiencing a medical event that required attention, Pettway relayed Robert's symptoms to Crawford who determined Pettway should call an ambulance based on her concern that Robert may be experiencing a heart attack, a condition for which the MCMJ was not equipped to evaluate, and Pettway contacted an ambulance

service for Robert after approximately twenty-eight (28) minutes from when she first entered the intake area to evaluate Robert.  The evidence, viewed in Robert's favor, shows Crawford and Pettway had subjective knowledge of a risk of serious harm to Robert based on Pettway's initial evaluation and promptly acted to address the risk of harm to Robert based on their evaluation of his condition and the course of treatment that Crawford deemed appropriate.

Indeed, Robert has not submitted expert testimony that the course of treatment that Crawford determined for him, and Pettway executed, was inappropriate, based on the circumstances, while Crawford and Pettway have submitted the affidavit of Lisa A. Meaker ("Meaker"), DMP, RN, FNP-C, a board-certified family nurse practitioner, who has practiced as a nurse since 2014.  Doc. 205-12.  Meaker provides her assessment that Crawford and Pettway's actions were reasonable.  *Id.*  Meaker opines Crawford and Pettway "acted within the standard of care," and did not "delay[ ] and/or den[y] necessary nursing care" to Robert.  *Id.* at 1, 9.  Sophia Barnes, CRNP, who was a STATCare offsite Nurse Practitioner for NaphCare at the MCMJ when Robert was booked, was deposed in this matter and explained NaphCare had a policy to not administer medications that are brought in the MCMJ by those arrested because they could not verify the medications with absolute certainty.  Doc. 205-10 at 13-14.  Barnes also opined if an inmate presented with esophageal spasms and trouble breathing, the appropriate standard of care for such a situation would be a general exam of the inmate and, if the exam determined the inmate presented chest pain, or cardiac issues, and high blood pressure, an ambulance should be summoned for the inmate to be further evaluated.  *Id.* at 9.

Accordingly, Robert cannot show that either Crawford or Pettway acted with deliberate indifference to his serious medical need, and Crawford and Pettway's motion for summary

judgment as to Robert's deliberate indifference to a serious medical need claim is due to be **GRANTED**.

### B. Crawford and Pettway's Motion to Exclude (Doc. 206)

In Crawford and Pettway's motion to exclude, they argue the Court should exclude, pursuant to Fed. R. Evid. 702, testimony from Robert's expert Ramzy Rimawi, M.D.  Doc. 206. In support of the motion, Crawford and Pettway argue Dr. Rimawi's opinions do not assist the Court with the decision as to whether Crawford and Pettway were deliberately indifferent to Robert's serious medical need.  Doc. 207 at 1-2.  Crawford and Pettway argue Dr. Rimawi does not know the actions or inactions that were taken by either of them and he did not analyze the medical care and treatment they provided to Rone.  *Id.* at 2.

Indeed, in Robert's response to the motion to exclude, he acknowledges Dr. Rimawi "does not know what the nurse Defendants did, what the jail or NaphCare policies are, or even what deliberate indifference is" and he is solely a causation expert in this matter, who opined the stress that Robert experienced from his arrest and surrounding events caused him to develop shingles and chronic postherpetic neuralgia, as well as suffer symptoms consistent with post-traumatic stress disorder.  Doc. 228 at 2, 6 (citing Doc. 227-1 at 8).  These may be effects, but this opinion is not relevant to the claims.

The admission of expert testimony is governed by Fed. R. Evid. 702, which provides that, if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," a witness "qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise."  The U.S. Supreme Court elucidated this requirement in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993), and its progeny, noting that district courts are

gatekeepers charged with ensuring that "speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002). In determining the admissibility of expert testimony under *Daubert,* the district court must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable*;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291-92 (11th Cir. 2005). "While there is inevitably some overlap among the basic requirements — qualification, reliability, and helpfulness — they remain distinct concepts and the courts must take care not to conflate them." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted).

The district court's objective is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The proponent of the expert testimony bears the burden of demonstrating  the expert is qualified to render his testimony, the methodology by which he reached his conclusions is sufficiently reliable, and his opinions will assist the trier of fact. *Id*. If a witness' qualifications to render an opinion rest exclusively or primarily on experience, the witness "must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. at 1261 (internal quotations and citation omitted) (emphasis in original). Reliability may not be premised "merely by the *ipse dixit* of an admittedly qualified expert." *Id*. When determining reliability, the district court may take into consideration a range of factors, including: (1) whether

the expert's theory can be, and has been, tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) whether the employed technique has a known error rate; and (4) whether the methodology is generally accepted in the scientific community. *Id*. at 1262; *McCorvey*, 298 F.3d at 1256. These factors, however, are non-exhaustive. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home,* 996 F.2d 266, 268 (11th Cir. 1993).

Since Dr. Rimawi's expert opinions are limited to medical effects and do not address whether Crawford and Pettway were deliberately indifferent to Robert's serious medical need, they are not relevant to the claims. Rather, they would only be relevant as to any damages. Since the Court determined summary judgment is granted on the claims for deliberate indifference to a serious medical need, the motion to exclude is **DENIED**.

## C.    Crawford and Pettway's Motions to Strike

In Crawford and Pettway's motion to strike references, they argue the Court should strike Robert's references to the testimony of Dr. Rimawi that are in his response to their motion for summary judgment and incorporate by reference their arguments that are detailed in their motion to exclude. Doc. 241 at 1-3. Since Dr. Rimawi's expert opinions are limited to medical effects and do not address whether Crawford and Pettway were deliberately indifferent to Robert's serious medical need, for the same reasons as stated above, the motion to strike references is due to be **DENIED**.

As to Crawford and Pettway's motion to strike comments about counsel's truthfulness in the surreply to their motion for summary judgment, they state Robert accuses their counsel of lying

to the Court about a response to a subpoena that was issued by Robert to non-party NaphCare, who is represented by the same counsel. *Id.* at 3. The subpoena request was for medication inventories at the MCMJ for May 7, 2021, when Robert suffered esophageal spasms at the MCMJ. Doc. 172. Robert filed a motion to compel additional records of such medication inventories (Doc. 172) that was briefed by the parties (Docs. 175, 188) and came before the Magistrate Judge for oral argument on May 14, 2025 (Doc. 190). Ultimately, the Magistrate Judge found unwarranted an additional response by NaphCare to Robert's request and denied his motion to compel such response. Doc. 199. No objection to the Magistrate Judge's Order was filed, but Robert seemingly tries to challenge it the Order in his surreply to the motion for summary judgment. Robert's assertions in his surreply are based on documents and information that were produced before the Magistrate Judge entered her Order.

A party may seek review of a magistrate judge's ruling on a non-dispositive matter by serving and filing objections within fourteen (14) days after being served with a copy. FED. R. CIV. P. 72(a). A non-dispositive matter is one that does not dispose of a claim or defense of any party. *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1365 (11th Cir. 2007). "A judge of the court may reconsider any pretrial matter [on a non-dispositive issue] where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *accord* Fed. R. Civ. P. 72(a) ("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."). A finding is clearly erroneous if "the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed." *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997). Put another way, "[i]n the absence of a legal error, a district court may reverse only if there was an abuse of discretion by the magistrate judge." *S.E.C.*

*v. Merkin*, 283 F.R.D. 699, 700 (S.D. Fla. 2012) (internal quotation marks and citation omitted); *see also Dees v. Hyundai Motor Mfg. Ala., LLC*, 524 F. Supp. 2d 1348, 1350 (M.D. Ala. 2007) (stating same).  In sum, it is an extremely deferential standard.  *See Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) (citation omitted).

Since Robert's assertions in his surreply are based entirely on information that was already produced and available before the Magistrate Judge entered her Order for his motion to compel, any objection to the Order should have been filed within fourteen (14) days of being served a copy of the Order.  Robert did not file a timely objection to the Order and has not submitted new evidence for the Court to consider the issue outside the time for him to object.  Therefore, the Court can only conclude from Robert's surreply he intends to relitigate the issue of his motion to compel.  However, the Court declines to address Robert's arguments because they are untimely pursuant to Fed. R. Civ. P. 72(a).  Since the Court does not consider Robert's arguments in his surreply, including the accusations of impropriety by Crawford and Pettway's counsel, the motion to strike comments about counsel's truthfulness is **DENIED**.

**D.    Lott's Motion for Summary Judgment (Doc. 208)**

In Lott's motion for summary judgment, he makes several arguments: (1) he is entitled to absolute prosecutorial immunity because his role during the relevant events was intertwined with Herren's prosecutorial role; (2) even if he is not entitled to absolute prosecutorial immunity, he is entitled to qualified immunity because Robert cannot show Lott either instituted or continued Robert's criminal prosecution, Lott did not have arguable probable cause to submit the report to the DA's Office and sign the complaint against Robert, Lott violated a clearly established right, or malice by Lott; (3) the facts of this matter cannot support a claim for outrage, a cause of action that is recognized in only limited instances; and (4) Robert's civil conspiracy claim fails because

his other claims that he brings are due to be dismissed and he cannot show Lott and Herren agreed to accomplish an unlawful plan.  Doc. 208.

       In response to Lott's motion for summary judgment, as to the first argument, Robert argues Lott is not entitled to absolute prosecutorial immunity because Lott performed an investigative function when he assisted Herren with the interview of Butts, served as a complaining witness in support of the warrant for Robert, and provided false statements in support of the warrant.  Doc. 233 at 21-25.

       As to Lott's second argument, Robert argues Lott is not entitled to qualified immunity.  *Id.* at 25-32.  Robert does not dispute Lott acted within his discretionary authority when he performed the relevant acts in this matter.  *Id.* at 25.  Robert argues Lott instituted and continued a criminal prosecution against him because, to secure the warrant for Robert, he provided false information.  *Id.* at 26-27.  Robert also argues Lott did not investigate Butts' interview statements and provided false allegations to the magistrate judge.  *Id.* at 27.  As to malice, Robert argues Butts disputes many of the statements that were attributed to her in Lott's report of her interview, Lott did not conduct a reasonable investigation of the matter, and Lott threatened Butts for her to testify.  *Id.* at 28.  As to probable cause, Robert argues Lott's report misstates the date when the bathroom incident occurred, Butts disputes many of the statements that are attributed to her in Lott's report, and Lott did not conduct a reasonable investigation of the matter.  *Id.* at 29-32.

       As to Lott's third argument, Robert argues his outrage claim presents distinct legal issues from a Fourth Amendment reasonableness determination and he has sufficiently supported his claim. *Id.* at 37.

       As to Lott's fourth argument, Robert argues there is sufficient circumstantial evidence of a conspiracy between Lott and Herren.  *Id.* at 38-40.

1.    **Federal Claims**

a.    **Absolute Prosecutorial Immunity**

In civil cases that are brought pursuant to 42 U.S.C. § 1983, "prosecutors have absolute immunity for all activities that are intimately associated with the judicial phase of the criminal process." *Rehberg v. Paulk*, 611 F.3d 828, 837 (11th Cir. 2010) (citations and internal quotation marks omitted). The Supreme Court employs a "functional approach" to determine whether an individual is entitled to absolute prosecutorial immunity. *Kassa v. Fulton County*, 40 F. 4th 1289, 1292 (11th Cir. 2022) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)). This fact-specific inquiry "looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citation and internal quotation marks omitted); *see also Kassa*, 40 F.4th at 1294 (explaining the functional approach "look[s] at whether immunity is justified for the specific function in question). Those who assert absolute prosecutorial immunity's shield bear the burden of establishing its application based on the function(s) in question. *Burns*, 500 U.S. at 486 (citation omitted).

Absolute immunity applies to a prosecutor's activities "in initiating a prosecution and in present the State's case." *Rehberg*, 611 F.3d at 837 (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)). Stated differently, immunity will apply for "acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the state." *Kassa*, 40 F.4th at 1293 (citation omitted). Prosecutors have been found to be immune for the initiation or continuation of a prosecution, appearances before grand juries or other judicial proceedings, the examination of witnesses and presentation of evidence. *See id.*, 611 F.3d at 837-38. However, absolute prosecutorial immunity is not limited to conduct inside the courtroom and typically applies to "preparation for those activities, including the evaluation of

evidence and information." *Ward v. Chafin*, Civ. Act. 2023 U.S. App. LEXIS 7326, at *6 (11th Cir. 2023); *see also Buckley*, 509 U.S. at 273 (noting application of immunity to "the professional evaluation of evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made."). The Eleventh Circuit has extended absolute immunity to prosecutors for "filing an information without investigation, filing charges without jurisdiction, filing a baseless detainer, offering perjured testimony, suppressing exculpatory evidence, refusing to investigate complaints about the prison system, and threatening further criminal prosecutions." *Kassa*, 40 F.4th at 1293 (citations omitted).

However, if a prosecutor performs functions that are not associated with their role "as an advocate for the state," only qualified immunity is available. *Hart v. Hodges*, 587 F.3d 1288, 1295 (11th Cir. 2009) (citations omitted). For example, absolute immunity does not attach when prosecutors engage in certain investigative or administrative functions. *Hoffman v. Off. of the State Atty.*, 793 F. App'x 945, 950 (11th Cir. 2019) (citations omitted); *see also Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004) ("A prosecutor functions as an investigator when he searches for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested.") (citation and internal punctuation marks omitted)); *Rehberg*, 611 F.3d at 842 ("A prosecutor loses the cloak of absolute immunity by stepping out of his role as an advocate and performing 'investigative' functions more commonly performed by law enforcement officers." (citation omitted)). Prosecutorial immunity also does not attach when an officer gives advice to police during a criminal investigation, when a prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness. *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (compiling cases).

The cases to which Lott cites in which an investigator was extended absolute prosecutorial

immunity involve investigators who were employed by district attorneys' offices as opposed to, in this case, an investigator who was employed by the local police department and aided an ADA with a witness interview. *See Gardner v. Bottoms*, Civ. Act. No. 23-12772, 2025 U.S. App. LEXIS 5823, 2025 WL 799282 (11th Cir. Mar. 13, 2025); *Norton v. Liddel*, 620 F.2d 1375 (10th Cir. 1980); *Atkins v. Lanning*, 556 F.2d 485 (10th Cir. 1977); *Waits v. McGowan*, 516 F.2d 203 (3rd Cir. 1975); *Garza v. Guerra*, Civ. Act. No. B-08-084, 2009 U.S. Dist. LEXIS 3304, 2009 WL 136022 (S.D. Tex. Jan. 20, 2009); *Slaughter v. City of Philadelphia*, Civ. Act. No. 94-2329, 1995 U.S. Dist. LEXIS 227, 1995 WL 12060 (E.D. Penn. Jan. 12, 1995); *see also Files v. King*, Civ. Act. No. 1:17-cv-1632-KOB-HNJ, 2018 U.S. Dist. LEXIS 154737 (N.D. Ala. July 31, 2018) (holding same that D.A.'s investigator also entitled to absolutely immunity for acts done within the prosecutorial role and citing several of the above cases). The Court first finds that none of these cases are binding even as to the holding asserted, but do constitute persuasive authority. Regardless, that is not the situation at hand.

Lott does not cite to any authority (binding or otherwise) that extends absolute prosecutorial immunity to a law enforcement officer that was not directly employed by a district attorney's office and aids a prosecutor in their role as such, and in any case, absolute prosecutorial immunity does not attach when an officer acts as a complaining witness, and personally attests to the truth of the allegations that support a warrant, as Lott did for the warrants in this matter. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) ("We have held that absolute immunity does not apply when a prosecutor . . . acts as a complaining witness in support of a warrant application." (internal citation omitted)).

Therefore, the Court finds the Defendant's argument as to absolute immunity unavailing. Regardless, the Court need not make a finding on the issue given that the Court finds that qualified

immunity does apply in the next section – which has the same ultimate effect.

### b.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To be protected by qualified immunity, the government official must first demonstrate that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred.  *Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (citing *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016)); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  "Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Garcia*, 75 F.4th at 1185 (quotation omitted).

The first inquiry may be a mixed question of law or fact, but the second inquiry is purely a question of law.  *Hall v. Flournoy*, 975 F.3d 1269, 1275 (11th Cir. 2020).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (citing *Pearson*).  If a plaintiff fails to establish either one, then the defendant is entitled to qualified immunity.

An officer acts within his discretionary authority when his behavior is "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)); *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995).

"Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (quoting *Holloman*, 370 F.3d at 1266). Therefore, an officer may still be acting within his discretionary authority even if/when violating the constitution. The relevant analysis is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations and internal quotations omitted).

Courts utilize a two-part framework to evaluate qualified immunity claims. *Castle v. Appalachian Tech. College*, 631 F.3d 1194, 1197 (11th Cir. 2011). The first element is whether the plaintiff's allegations, if true, establish a constitutional violation. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second element is whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. at 232. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Garcia*, 75 F.4th at 1185 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). This demanding standard protects "all but the plainly incompetent or those who

knowingly violate the law." *Malley v. Briggs*, 475 U. S. 335, 341 (1986).  As to the second prong

of the analysis, courts "recognize three sources of law that would put a government official on

notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles

of law enunciated in relevant decisions; and factually similar cases already decided by state and

federal courts in the relevant jurisdiction."  *Goebert v. Lee County.*, 510 F.3d 1312, 1330 (11th

Cir. 2007).  Courts will also look beyond caselaw to whether the case at hand is one of "obvious

clarity" – i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth

Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official],

notwithstanding the lack of fact-specific case law" on point.  *Oliver v. Fiorino*, 586 F.3d 898, 907

(11th Cir. 2009) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)).  In such

situations where it is so obvious, courts have repeatedly held that the constitutional violation is

clearly established even though there is no decision in a "materially similar preexisting case."

*Cantu*, 974 F.3d at 1235 (citations and internal quotations omitted).  That said, "the clearly

established law standard is a demanding one."  *Id*. (citing *Wesby*, 583 U.S. at 63; *City & Cnty. of

San Francisco. v. Sheehan*, 575 U.S. 600 (2015)).

### 1.    Malicious Prosecution

To prove a Fourth Amendment malicious-prosecution claim in our Circuit, a
plaintiff must establish four elements: (1) the plaintiff was seized under legal
process; (2) the legal process justifying the plaintiff's seizure was constitutionally
infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the
seizure would not otherwise be justified without legal process. *See* [*Butler v. Smith*,
85 F.4th 1102,] 1111–12 [(11th Cir. 2023)] (outlining the relevant elements and
how they merge); *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022)
(identifying a simplified two-step test that breaks down into these elements).

*Gervin v. Florence*, 139 F.4th 1236, 1248 (11th Cir. 2025).

The Supreme Court has explained that "[i]n American courts as of 1871, the
malicious prosecution tort generally allowed recovery against an individual who
had initiated or caused the initiation of criminal proceedings despite having 'no

good reason to believe' that criminal charges were 'justified by the facts and the law.'" *Thompson* [*v. Clark*], 596 U.S. [36,] 43 [(2022)] (quoting THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS OR THE WRONGS WHICH ARISE INDEPENDENT OF CONTRACT 180 (Chi., Callaghan & Co. 1879)). During that period, a plaintiff could state a claim for malicious prosecution by showing three elements: "(i) the suit or proceeding was 'instituted without any probable cause'; (ii) the 'motive in instituting' the suit 'was malicious,' which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution 'terminated in the acquittal or discharge of the accused.'" *Id.* at 44 (quoting COOLEY, *supra*, at 181).

Our precedent incorporates these three elements into a modern claim for violation of the Fourth Amendment's guarantee of security against unreasonable seizures. But because Section 1983 incorporates the elements of common-law torts only "so long as doing so is consistent with 'the values and purposes of the constitutional right at issue,'" *id.* at 43 (quoting *Manuel* [*v. City of Joliet*], 580 U.S. [357,] 370 [(2017)])—here, a Fourth Amendment violation—we combine the Fourth Amendment's constitutional elements with those of a traditional malicious-prosecution tort, *see Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (explaining that because "the claim is a mashup of sorts," plaintiffs must meet both the Fourth Amendment's requirements and those of the common-law tort of malicious prosecution). So a plaintiff must also prove that he was seized "pursuant to the legal process," *Heck v. Humphrey*, 512 U.S. 477, 484 [ ] (1994), "that the legal process justifying his seizure was constitutionally infirm," and "that his seizure would not otherwise be justified without legal process," *Williams* [*v. Aguirre*], 965 F.3d [1147,] 1165 [(11th Cir. 2020)].

In practice, though, a malicious-prosecution claim's common-law elements meld with the Fourth Amendment's textual components because a "significant overlap" exists between them. *Luke v. Gulley* ("*Luke I*"), 975 F.3d 1140, 1143 (11th Cir. 2020). For instance, "[i]f a plaintiff establishes that a defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process, he has also established that the defendant instituted criminal process against him with malice and without probable cause." *Id.* at 1144. So the questions whether a defendant instituted or continued a legal proceeding with malice and without probable cause "effectively merge[]" with our case law on unconstitutional seizures. *Butler*, 85 F.4th at 1112.

*Id.* at 1247-48.

### i.    Discretionary Authority

There is no dispute that Lott acted within his discretionary authority when he investigated the events of this matter then obtained an arrest warrant for Robert. *See generally Whiting v.*

*Traylor*, 85 F.3d 581, 585 (11th Cir. 1996) ("Obtaining an arrest warrant is one of the initial steps of a criminal prosecution.").

### ii.    Probable Cause or Arguable Probable Cause

"[T]he law requires that a warrant for an arrest be supported by sufficient information to establish probable cause." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (citations and internal quotation marks omitted). "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to ask whether a reasonable officer could conclude that there was a substantial chance of criminal activity." *Washington v. Durand*, 25 F.4th 891, 902 (11th Cir. 2022) (quotation and internal modifications omitted). "Although 'an arrest made without probable cause violates the Fourth Amendment,' an officer is entitled to qualified immunity if he has 'arguable probable cause.'" *Badia*, 47 F.4th at 1181 (11th Cir. 2022) (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)); *see also Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (also discussing that an officer need not have actual probable cause, but only arguable probable cause).

> An officer has arguable probable cause if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." [*District of Columbia v.* ]*Wesby*, 138 S. Ct. [577,] 593 [(2018)]. An officer lacks arguable probable cause only if "the state of the law on the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington* [*v. Howard*], 25 F.4th [891,] 903 [(11th Cir. 2022)] (quotation omitted). Accordingly, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) (emphasis omitted).

*Garcia*, 75 F.4th at 1186.

The Court will analyze whether Lott had probable, or arguable, cause to seek a warrant for Robert for the charge of intimidating a witness.

### (a)    Intimidating a Witness

Under Alabama law:

> A person commits the crime of intimidating a witness if he attempts, by use of a threat directed to a witness or a person he believes will be called as a witness in any official proceedings, to:
>
> > (1) Corruptly influence the testimony of that person;
> > (2) Induce that person to avoid legal process summoning him to testify; or
> > (3) Induce that person to absent himself from an official proceeding to which he has been legally summoned.

ALA. CODE § 13A-10-123(a)(1)-(3).  A "threat" means "any threat proscribed by [Ala. Code §]

13A-6-25 on criminal coercion."  ALA. CODE § 13A-10-123(b).

> A person commits the crime of criminal coercion if, without legal authority, he threatens to confine, restrain or to cause physical injury to the threatened person or another, or to damage the property or reputation of the threatened person or another with intent thereby to induce the threatened person or another against his will to do an unlawful act or refrain from doing a lawful act.

ALA. CODE § 13A-6-25(a).

> The Warrant Clause of the Fourth Amendment requires that warrant applications contain sufficient information to establish probable cause.  *Franks v. Delaware,* 438 U.S. 154 [ ] (1978).  "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing."  *Id.* at 164–65 [ ] (citation omitted) (emphasis in original).  While this condition does not dictate that the statements be objectively accurate, it does require that they "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."  *Id.* at 165 [ ].  Thus, a police officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information.  *See Malley v. Briggs,* 475 U.S. 335, 346 [ ] (1986); [*Jones v.*] *Cannon,* 174 F.3d [1271,] 1285 [(11th Cir. 1999)].  If "a reasonable police officer would have known that [Rolfe's] testimony was not just negligently false, but recklessly so," then Rolfe is not entitled to qualified immunity.  *Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994).

*Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003).

Here, Lott's report states, while Thomas' assault charge was pending in September 2021,

Butts was in a bathroom of the Residence and Robert and Thomas "cornered her while video

recording the encounter" and questioned her about what she would testify to in court. Lott's report states Rober and Thomas told Butts to testify Thomas was dressing himself when Fernando attacked him, which caused Thomas to act in self-defense. Lott's report states Butts said Robert continued to record her until they left her alone. During Herren's deposition, she stated she did not specifically remember Butts use the word "corner" but recalled Butts told her she felt like she could not leave and Robert and Thomas asked her about what she would testify to in court. Herren does not otherwise dispute Lott's report, and Lott believed Butts' statements to be credible when they were stated. At the preliminary hearing, Butts testified she felt scared and intimidated, and had to lie or say what Robert and Thomas wanted her to say or she would be harmed by Thomas but stated Robert neither threatened her with physical harm nor physically injured her. Butts testified she felt confined by Robert and Thomas during the bathroom incident because they were in the doorway and confirmed they wanted her to report Thomas stabbed Fernando in self-defense. Ultimately, the district judge found there was no probable cause to support Robert's charge of intimidating a witness. During Butts' deposition, she stated Robert and Thomas asked her questions "about court," but did not tell them what she was going to say in court. Butts stated Robert and Thomas were not bothering her.

Based on Butts' purported statement to Herren and Lott as well as her testimony at the preliminary hearing that confirmed she felt scared and intimidated by Robert, the Court finds Lott meets the lower standard of arguable cause to seek a warrant for Robert's arrest for intimidating a witness. While Robert did not verbally threaten to confine Butts in the bathroom, he stood in the doorway and remained there while he recorded her while they discussed her potential testimony in court, all of which made her feel intimidated and scared. In the context of a potential domestic violence-type case, the threshold for arguable cause is met.

Therefore, Robert cannot show the legal process that justified his seizure for intimidating a witness was constitutionally infirm to prove his malicious prosecution claim and, in turn, cannot show Lott violated his constitutional rights to prove Lott is not entitled to qualified immunity. Accordingly, Lott is entitled to qualified immunity as to the malicious prosecution claim for the charge of intimidating a witness, and Lott's motion for summary judgment as to Robert's malicious prosecution claim is due to be **GRANTED**.

### a.    State-Law Claims

#### i.    Outrage/Intentional Infliction of Emotional Distress

"[T]he tort of outrage is the same cause of action as intentional infliction of emotional distress." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 n.1 (Ala. 2017) (quoting *Thomas v. Williams*, 21 So. 3d 1234, 1237 (Ala. Civ. App. 2008)).

> For a plaintiff to recover under the tort of outrage, she must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990). The conduct complained of must "be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

This Court has previously recognized the tort of outrage in three circumstances:

> "The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989). *See also* Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed. 1996)."

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). . . . [T]his Court has <u>not</u> held that the tort of outrage can exist in <u>only</u> those three circumstances:

> "<u>That is not to say, however, that the tort of outrage is viable in only</u>

> the three circumstances noted in *Potts*.   Recently, this Court
> affirmed a judgment on a tort-of-outrage claim asserted against a
> family physician who, when asked by a teenage boy's mother to
> counsel the boy concerning his stress over his parents' divorce,
> instead began exchanging addictive prescription drugs for
> homosexual sex for a number of years, resulting in the boy's drug
> addiction.  *See O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011).  It is clear,
> however, that the tort of outrage is viable only when the conduct is
> "'so outrageous in character and so extreme in degree as to go
> beyond all possible bounds of decency, and to be regarded as
> atrocious and utterly intolerable in a civilized society."'  *Horne v.
> TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010) (quoting
> [*American Road Service Co. v.*] *Inmon*, 394 So. 2d [361, 365 (Ala.
> 1980)])."

*Little v. Robinson*, 72 So. 3d 1168, 1172-73 (Ala. 2011) (emphasis added).

*Wilson*, 266 So. 3d at 676-77.

Based on the Court's previous finding that Lott had arguable cause to seek a warrant for

Robert for the intimidating a witness charge, the Court finds Lott's conduct does not rise to the

level of conduct that is "so outrageous in character and so extreme in degree as to go beyond all

possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

society."  *Wilson*, 266 So. 3d at 677 (citations omitted).

Accordingly, Lott's motion for summary judgment as to Robert's outrage claim is due to

be **GRANTED**.

### ii.      Civil Conspiracy

The Supreme Court of Alabama adopted the elements of a claim for civil conspiracy that

are stated in Jolowicz & Lewis, Winfield on Torts, Conspiracy 557, 559, 560 (8th ed. 1967) and

were summarized as follows:

> '(a) Purpose.  The most important feature of a tortious conspiracy where unlawful
> means are not used is that the object or purpose of the combination must be to cause
> damage to the plaintiff.  It is not a matter of "intention" as that word is normally
> used in the law, for intention signifies not what a person is aiming at but what may
> reasonably be expected to flow from what he does, while for conspiracy the test is

"what is in truth the object in the minds of the combiners when they acted as they did."  Malice in the sense of malevolence, spite or ill-will is not an essential for liability; what is required is that the combiners should have acted In order that (not So that) the plaintiff should suffer damage.  If they did not act in order that the plaintiff should suffer damage they are not liable, however selfish their attitude and however inevitable the plaintiff's damage may have been.

. . .

(b) Combination.  There must, of course, be concerted action between two or more persons . . .

(c) Overt act causing damage. . . . an overt act causing damage is an essential of liability in tort. . . .

*Snyder v. Faget*, 326 So. 2d 113, 119 (Ala. 1976) (citation omitted).  "Liability for civil conspiracy rests upon the existence of an underlying wrong, and if the action alleged to constitute the underlying wrong provides no cause of action, then neither does the conspiracy itself."  *Barber v. Bus. of Prods. Ctr., Inc.*, 677 So. 2d 223 (Ala. 1996) (citing *Jones v. BP Oil Co.*, 632 So. 2d 435 (Ala. 1993)); *see Callens v. Jefferson Cnty. Nursing Home*, 769 So. 2d 273, 280 (Ala. 2000) ("A plaintiff alleging a conspiracy must have a valid underlying cause of action."); *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993) ("[A] conspiracy claim must fail if the underlying act itself would not support an action.").

Here, as discussed, Robert's malicious prosecution claim fails, and therefore, the underlying wrong to his civil conspiracy claim does not provide a cause of action.  Accordingly, Lott's motion for summary judgment as to Robert's civil conspiracy claim is due to be **GRANTED**.

## V.    CONCLUSION

Accordingly, it is **ORDERED** as follows:

1.    Defendants Felecia Crawford and Kiesha Pettway's Motion for Summary Judgment (Doc. 203) is **GRANTED**, and Plaintiff Robert Earl Rone's claims that he brings against Defendants Felecia Crawford and Kiesha Pettway are **DISMISSED with prejudice**.

2.     Kiesha Pettway and Felicia Crawford's Rule 702 Motion to Exclude Testimony from Plaintiff's Purported Expert Ramzy Rimawi, M.D. (Doc. 206) is **DENIED**.

3.     Kiesha Pettway and Felicia Crawford's Motion to Strike References Made to Plaintiff's Purported Expert, Dr. Rimawi, Contained in Rone's Response to Crawford and Pettway's Motion for Summary Judgment and Motion to Strike Rone's Comments About Counsel's Truthfulness (Doc. 241) are **DENIED**.

4.     Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 208) is **GRANTED**, and Plaintiff Robert Earl Rone's claims that he brings against Defendant Alex Lott are **DISMISSED with prejudice**.

A separate judgment will issue pursuant to Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this 10th day of February 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE